No. 13-466C
(Consolidated Action)
(Judge Sweeney)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

JOSEPH CACCIAPALLE and MELVIN BAREISS,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MOTION TO DISMISS

---

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:

PETER A. BIEGER
Assistant General Counsel
KATHERINE M. BRANDES
Attorney Advisor
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C.  20220

KENNETH M. DINTZER
Acting Deputy Director
ELIZABETH M. HOSFORD
GREGG M. SCHWIND
Senior Trial Counsel
KATY M. BARTELMA
SETH W. GREENE
ERIC E. LAUFGRABEN
DANIEL B. VOLK
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480 Ben Franklin Station
(202) 616-0385
kenneth.dintzer@usdoj.gov

December 9, 2013

Attorneys for Defendant

# **TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 5

    I.     History Of Fannie Mae And Freddie Mac ............................................... 5

    II.    The Housing And Economic Recovery Act Of 2008 ............................. 6

    III.   The Government's Rescue Of Fannie Mae And Freddie Mac ............................... 7

         A.    Fannie Mae's And Freddie Mac's Financial Distress ................................ 7

         B.    The Conservatorships And Treasury Agreements ...................................... 8

    IV.   Plaintiffs' Suit In This Court ................................................................... 10

ARGUMENT ................................................................................................................. 11

    I.     Standards Of Review ............................................................................... 11

    II.    The Court Lacks Jurisdiction Over Plaintiffs' Complaint ..................... 12

         A.    The Court Should Dismiss The Complaint Because The
              Complaint Is Against The Conservator, And FHFA Is Not
              The United States When It Acts As Conservator...................................... 12

             1.    The Tucker Act Grants The Court of Federal Claims
                   Jurisdiction Over Claims Against The United States ........................ 13

             2.    For Purposes Of The Tucker Act, FHFA Is Not The
                   United States When Acting As Conservator For Fannie
                   Mae And Freddie Mac ...................................................................... 13

         B.    The Court Lacks Jurisdiction To Entertain Plaintiffs'
               Challenge To FHFA's Discretion As Conservator ................................... 16

         C.    The Complaint Should Be Dismissed Under 28 U.S.C.
               § 1500................................................................................................... 18

    III.   Plaintiff Shareholders Lack Standing To Bring Suit ............................. 21

         A.    Plaintiffs Lack Standing To Sue Because HERA Expressly
               Provides That FHFA Succeeded To All Shareholder Rights................... 21

         B.    Shareholders Lack Standing To Bring Claims Based Upon
               An Alleged Loss Of Share Value Or Dividends ...................................... 23

    IV.   Plaintiffs Fail To State A Viable Takings Claim ................................... 25

i

A.     Treasury Cannot Be Subject To Takings Liability Because The Third Amendment Was Executed By The Government Acting As A Market Participant Rather Than A Sovereign ..................... 26

    1.  Courts Distinguish Between Sovereign And Proprietary Acts ................................................................................................ 26

    2.  Plaintiffs' Takings Claims Against Treasury Are Based Soley On Proprietary Acts ................................................... 27

B.     Plaintiffs' Ownership Of Shares In The Enterprises Does Not Create A Legally Cognizable Property Interest For Purposes Of A Takings Claim ................................................... 28

C.     Plaintiffs Have Not Alleged The Facts Necessary For A Taking ......................................................................................... 32

    1.  Plaintiffs Cannot Plausibly Allege A Categorical Regulatory Taking .............................................................. 33

    2.  Plaintiffs Cannot Establish A *Penn Central* Regulatory Taking ................................................................................... 34

D.     Plaintiffs' Claims Are Not Ripe For Judicial Review ............................. 38

    1.  This Court May Not Consider Claims That Are Not Ripe ........................................................................................ 38

    2.  Plaintiffs' Claim For Loss Of Dividend Rights Is Not Ripe ........................................................................................ 39

    3.  Plaintiffs' Claim For Loss Of Liquidation Preference Rights Is Not Ripe ........................................................... 41

CONCLUSION ........................................................................................... 42

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

*767 Third Ave. Assocs. v. United States*,
  48 F.3d 1575 (Fed. Cir. 1995) ................................................................. 14

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ................................................................................... 39

*Acceptance Ins. Cos., Inc. v. United States*,
  583 F.3d 849 (Fed. Cir. 2009) ....................................................... 11, 29, 31

*Adams v. United States*,
  20 Cl. Ct. 132 (1990) ................................................................................. 18

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*,
  988 F.2d 1157 (Fed. Cir. 1993) ................................................................. 12

*Aetna Life Ins. Co. v. Haworth*,
  300 U.S. 227 (1937) ................................................................................... 38

*AG Route Seven P'ship v. United States*,
  57 Fed. Cl. 521 (2003) ............................................................................... 15

*Alaska Airlines v. Johnson*,
  8 F.3d 791 (Fed. Cir. 1993) ......................................................... 26, 27, 28

*Alves v. United States*,
  133 F.3d 1454 (Fed. Cir. 1998) ................................................................. 14

*Am. Cont'l Corp. v. United States*,
  22 Cl. Ct. 692 (1991) ................................................................... 29, 31, 35

*Am. Pelagic Fishing Co, L.P. v. United States*,
  379 F.3d 1363 (Fed. Cir. 2004) ........................................................... 25, 29

*Ambase v. United States*,
  61 Fed. Cl. 794 (2004) ............................................................................... 15

*Ameristar Fin. Servicing Co. LLC v. United States*,
  75 Fed. Cl. 807 (2007) ..................................................................... 13, 14, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 11

*Bair v. United States,*
    515 F.3d 1323 .......................................................................................................... 29, 31

*Beekwilder v. United States,*
    55 Fed. Cl. 54 (2002) .............................................................................................. 39, 41

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...................................................................................................... 11

*Branch Banking & Trust Co. v. United States,*
    98 F. Supp. 757 (Ct. Cl. 1951)...................................................................................... 26

*Branch v. United States,*
    69 F.3d 1571 (Fed. Cir. 1995)................................................................................. passim

*Brandt v. United States,*
    710 F.3d 1369 (Fed. Cir. 2013) .................................................................................... 20

*Brown v. United States,*
    105 F.3d 621 (Fed. Cir. 1997)................................................................................. 13, 18

*Buckley v. Valeo,*
    424 U.S. 1 (1976).......................................................................................................... 38

*Cal. Hous. Sec., Inc. v. United States,*
    959 F.2d 955 (Fed. Cir. 1992),............................................................................... passim

*Cienega Gardens v. United States,*
    331 F.3d 1319 (Fed. Cir. 2003)..................................................................................... 34

*Commonwealth Edison Co. v. United States,*
    56 Fed. Cl. 652 (2003) ............................................................................................ 38, 40

*Cox v. Kurt's Marine Diesel of Tampa, Inc.,*
    785 F.2d 935 (11th Cir. 1986) ...................................................................................... 26

*De-Tom Enters., Inc. v. United States,*
    552 F.2d 337 (Ct. Cl. 1977) .......................................................................................... 18

*Esther Sadowsky Testamentary Trust v. Syron,*
    639 F. Supp. 2d 347 (S.D.N.Y. 2009)............................................................................ 22

*Franklin Savings Corporation v. United States,*
    46 Fed. Cl. 533 (2000) .................................................................................................. 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000)....................................................................................................... 21

*Gaff v. Fed. Deposit Ins. Corp.*,
    814 F.2d 311 (6th Cir. 1987) ......................................................................... 23, 24

*Golden Pac. Bancorp v. United States*,
    15 F.3d 1066 (Fed. Cir. 1994).......................................................................... passim

*Golden Pacific Bancorp v. United States*,
    25 Cl. Ct. 768 (1992), ...................................................................................... 16, 18

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
    486 F.3d 430 (8th Cir. 2007) ................................................................................ 33

*Herron v. Fannie Mae*,
    857 F. Supp. 2d 87 (D.D.C. 2012) .................................................................. 13, 14

*Holland v. United States*,
    59 Fed. Cl. 735 (2004) .......................................................................................... 24

*Hometown Fin., Inc. v. United States*,
    56 Fed. Cl. 477 (2003) ..................................................................................... 23, 24

*Huntleigh USA Corp. v. United States*,
    525 F.3d 1370 (Fed. Cir. 2008)............................................................................. 25

*I.M. Frazer v. United States*,
    288 F.3d 1347 (Fed. Cir. 2002)............................................................................. 15

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*,
    643 F. Supp. 2d 790 (E.D. Va. 2009), .................................................................. 22

*Indium Corp. of Am. v. Semi-Alloys, Inc.*,
    781 F.2d 879 (Fed. Cir. 1985)............................................................................... 11

*Invs., Inc. v. United States*,
    85 Fed. Cl. 447 (2009) .......................................................................................... 34

*Kellmer v. Raines*,
    674 F.3d 848 (D.C. Cir. 2012) .............................................................................. 22

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)............................................................................................... 25

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)................................................................................. 25, 33, 34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................................... 21

*M & J Coal Co. v. United States*,
    47 F.3d 1148 (Fed Cir. 1995) ............................................................. 29

*Maritrans, Inc. v. United States*,
    342 F.3d 1344 (Fed. Cir. 2003) ................................................ 31, 39, 40

*Mass. Bay Transp. Auth. v. United States*,
    21 Cl. Ct. 252 (1990) ............................................................ 38, 40

*Matthews v. United States*,
    72 Fed. Cl. 274 (2006) ............................................................ 11

*New York v. Nickals*,
    119 U.S. 296 (1886) ............................................................... 36

*O'Melveny & Myers v. Fed. Deposit Ins. Corp.*,
    512 U.S. 79 (1994) ........................................................... 13, 14, 15

*Pa. Coal Co. v. Mahon*,
    260 U.S. 393 (1922) ............................................................... 25

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001) ............................................................... 31

*Penn Central Transportation Co. v. City of New York*,
    438 U.S. 104 (1978) ............................................................... 34

*PIN/NIP, Inc. v. Platte Chem. Co.*,
    304 F.3d 1235 (Fed. Cir. 2002) ................................................... 11

*Rick's Mushroom Serv., Inc. v. United States*,
    521 F.3d 1338 (Fed. Cir. 2008) ................................................... 18

*Robo Wash, Inc. v. United States*,
    223 Ct. Cl. 693 (1980) ........................................................... 23

*Rose Acre Farms, Inc. v. United States*,
    559 F.3d 1260 (Fed. Cir. 2009) ................................................... 37

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ............................................................... 27

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ..................................................... 12

*Seiber v. United States*,
    364 F.3d 1356 (Fed. Cir. 2004) ................................................... 34

*Sharp v. United States*,
    566 F.2d 1190, 215 Ct. Cl. 883 (Ct. Cl. 1977)................................................................. 16, 17

*Sobchack v. Am. Nat'l Bank & Tr. Co. of Chicago*,
    (In re Ionosphere Clubs, Inc.), 17 F.3d 600 (2d Cir. 1994) ........................................ 23

*Souders v. S.C. Pub. Serv. Auth.*,
    497 F.3d 1303 (Fed. Cir. 2007)....................................................................................... 14

*St. Christopher Assocs., LP v. United States*,
    511 F.3d 1376 (Fed. Cir. 2008)................................................................................ 27, 28

*Statesman Sav. Holding Corp. v. United States*,
    41 Fed. Cl. 1 (1998) ...................................................................................................... 24

*Suitum v. Tahoe Reg'l Planning Agency*,
    520 U.S. 725 (1997)................................................................................................ 39, 41

*Sun Oil Co.v. United States*,
    572 F.2d 786 (Ct. Cl. 1978) ............................................................................. 26, 27, 28

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002).................................................................................................... 33

*Taylor v. United States*,
    303 F.3d 1357 (Fed. Cir. 2002)...................................................................................... 13

*Tecon Engineers, Inc. v. United States*,
    343 F.2d 943 (Ct. Cl. 1965) ......................................................................................... 19

*Texas v. United States*,
    523 U.S. 296 (1998)................................................................................................ 39, 40

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
    338 F.3d 1353 (Fed. Cir. 2003)....................................................................................... 11

*United States v. Keene Corp.*,
    508 U.S. 200 (1993)..................................................................................................... 20

*United States v. Mitchell*,
    445 U.S. 535 (1980)..................................................................................................... 13

*United States v. Tohono O'Odham Nation*,
    131 S. Ct. 1723 (2011)........................................................................................ 18, 19, 20

*UNR Industries, Inc. v. United States*,
    962 F.2d 1013 (Fed. Cir. 1992)..................................................................................... 20

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)...................................................................... 37

*Wabash Ry. Co. v. Barclay*,
    280 U.S. 197 (1930)................................................................. 36

*Yuba Goldfields, Inc. v. United States*,
    723 F.2d 884 (Fed. Cir. 1983)................................................. 27

## FEDERAL STATUTES AND REGULATIONS      PAGE

12 U.S.C. § 1719(a), (b)........................................................................ 7

12 U.S.C. § 1821(d)(2)(A)(i) ................................................................ 15

12 U.S.C. § 4501 et seq. (2007)............................................................ 6

12 U.S.C. § 4513(b)(1) .......................................................................... 6

12 U.S.C. § 4617 .................................................................. 4, 8, 30, 32

12 U.S.C. § 4617(a)(2)................................................................... 7, 30

12 U.S.C. § 4617(b)(2) ....................................................................... 30

12 U.S.C. § 4617(b)(2)(A) .................................................................. 15

12 U.S.C. § 4617(b)(2)(A)(i) .............................................................. 22

12 U.S.C. § 4617(b)(2)(A)(i), (B)(i) ..................................................... 7

12 U.S.C. § 4617(b)(2)(G) .................................................................. 30

12 U.S.C. § 4617(b)(2)(J) ................................................................... 30

12 U.S.C. § 4619 ................................................................................ 30

28 U.S.C. § 1491 ................................................................................ 13

28 U.S.C. § 1491(a)(1)................................................................. 13, 16

28 U.S.C. § 1500.......................................................................... 18, 19, 20

28 U.S.C. § 2680(a) ........................................................................... 17

### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JOSEPH CACCIAPALLE | ) | |
| and MELVIN BAREISS, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13-466C |
| | ) | (Consolidated Action) |
| v. | ) | (Judge Sweeney) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the complaint of Joseph Cacciapalle and Melvin Bareiss (plaintiffs)[1] for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.  In support of this motion, we rely upon plaintiffs' complaint and the following brief.

### INTRODUCTION

This case is about actions taken as part of the rescue of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises).  Exercising authority expressly granted by Congress, the Federal Housing Finance Agency (FHFA) placed the two failing mortgage giants into conservatorships in September 2008, while the Department of the Treasury (Treasury) committed to restore the safety and soundness of the Enterprises through agreements to make hundreds of billions of

---

[1]   By order dated October 29, 2013, the Court consolidated the actions in *American European Ins. Co. v. United States*, No. 13-496, and *Dennis v. United States*, No. 13-542, with the action in this case under the *Cacciapalle* caption and docket number.  On November 13, 2013, plaintiffs in the consolidated actions designated the complaint in *Cacciapalle* as the operative complaint for the consolidated action.  Therefore, all citations to the complaint in this motion are to the complaint filed in *Cacciapalle*.

dollars available.  As plaintiffs acknowledge, the conservatorships and the capital infusion were necessary because massive losses had rendered the entities insolvent.

Plaintiffs own junior preferred stock in Fannie Mae and Freddie Mac.  They purchased and held their shares with the knowledge that the Enterprises, because of their critical role in the housing market, are subject to broad Federal authority and regulation.  Plaintiffs did not challenge the rescue of the Enterprises in 2008.  Moreover, plaintiffs continued to stand by (and, in some cases, purchase more stock) as the Enterprises were resuscitated with Government assistance.  Only now, after the conservatorships have been in place for nearly five years – and only after Fannie Mae and Freddie Mac have shown signs of  recovery – have plaintiffs filed this suit, alleging that a 2012 amendment to FHFA's funding agreements with Treasury, known as the Third Amendment, constitutes a Fifth Amendment taking of shareholder rights.

Plaintiffs allege that the Third Amendment, which changed the dividend provision of the Enterprises' agreements with Treasury, effected a taking of their dividend and liquidation surplus rights as junior preferred shareholders.  Plaintiffs' claim defies logic, however, because they never possessed a right to dividends, and the Enterprises have not been liquidated.   The Government could not take something that never existed.

Even if assessed under the rubric of takings law, plaintiffs fail to allege facts that could state a viable takings claim.  There is no allegation of a physical invasion-type taking, nor could there be, given that the Third Amendment did not eliminate plaintiffs' preferred shares, which continue to be freely traded like any other equity.  The Court, then, is left to consider plaintiffs' allegations as a regulatory taking.  Although plaintiffs state that they do not challenge the Government's rescue of the Enterprises in 2008, their complaint challenges actions taken by the Government as part of that rescue.  Specifically, plaintiffs challenge an amendment to a funding

agreement between FHFA, standing in the shoes of the Enterprises, and Treasury. Plaintiffs'
challenge to the Third Amendment is at bottom a challenge to the conservatorship and the
decisions of the conservator. The United States Court of Appeals for the Federal Circuit has
consistently held, however, that no taking occurs when Federal regulators act in their capacity as
the conservator of a financial institution. *See, e.g.*, *Cal. Hous. Sec. v. United States*, 959 F.3d
955, 957-59 (Fed. Cir. 1992).

Moreover, even viewing the Third Amendment in isolation, plaintiffs' claim is defeated
by their acknowledgment that the funding agreements are contracts between the Enterprises and
Treasury. When the Government engages in commercial transactions, acting in its proprietary –
as opposed to its sovereign – capacity, such action cannot constitute a taking.

Plaintiffs' takings claim is also undermined by their acknowledgment that the
conservatorships were necessary because the Enterprises were insolvent; plaintiffs fail to allege
that the Enterprises – and plaintiffs' stock – would have survived absent Government
intervention in 2008 and thereafter, including the execution of the Third Amendment. As a
result, there is no basis upon which to claim that these actions, taken to maintain the Enterprises'
solvency, can be a taking.

Further, as a matter of law, shareholders could not have reasonably expected a dividend.
Shareholders possess no unconditional right to a dividend by law or by contract. This is
especially true during the conservatorships, when FHFA has exclusive authority to dispose of the
Enterprises' profits and other assets. Dividends are inherently discretionary. Here, Fannie Mae
and Freddie Mac advised their preferred shareholders in writing at the time the stock was issued
that shareholders are entitled to receive dividends "when, as, and if declared by the Board of
Directors . . . in its sole discretion." Holders of Fannie Mae and Freddie Mac junior preferred

stock are not entitled to dividends, and there is no remedy for the non-payment of dividends by the terms of the securities plaintiffs bought.  As such, there can be no taking.

Plaintiffs do not contend – much less point to a provision in any contract or applicable statute – that the Enterprises must declare a shareholder dividend while in conservatorship.  To the contrary, when announcing the conservatorships in September 2008, FHFA expressly stated that "common stock and preferred stock dividends *will be eliminated*."  (emphasis added). Plaintiffs apparently did not take FHFA at its word.  To the extent that plaintiffs complain about the corporate decision not to declare a dividend, that decision is a matter of the Enterprises' discretion, discretion that is not challengeable under the Housing and Economic Recovery Act of 2008 (HERA), 12 U.S.C. § 4617.  Similarly, the Court should reject plaintiffs' claim that their liquidation preference has been taken, because the Enterprises are not in liquidation, nor do plaintiffs have an absolute right to a liquidation surplus if no surplus will be available upon liquidation, as they allege.

Plaintiffs' failure to state a takings claim on the merits provides a straightforward basis to end the case.  Even before reaching those issues, however, plaintiffs' suit faces decisive jurisdictional barriers.  Plaintiffs' complaint focuses on FHFA's actions as conservator of the Enterprises and specifically on its decisions to enter into certain funding agreements with Treasury.  But plaintiffs cannot invoke this Court's jurisdiction to challenge FHFA's actions, given clear precedent that a Government regulator acting as a conservator is not the United States for purposes of the Tucker Act.  Further, there is no basis to challenge the actions of Treasury alone, given that it was FHFA's decision to enter into the funding agreements on behalf of the Enterprises.  And to the extent that plaintiffs allege tort-like claims, those too fall outside the Court's jurisdiction.

Finally, even if plaintiffs could identify a valid basis for jurisdiction, they cannot establish standing to sue.  Under HERA, FHFA succeeded to all rights of the Enterprises' shareholders when the Enterprises were placed into conservatorships.  Thus, the claims plaintiffs assert are not theirs to bring.  Those claims suffer from yet another standing problem.  It is a foundational principle of securities law, repeatedly affirmed by this Court, that shareholders may not sue in their individual capacities where the losses they allege amount to nothing more than a diminution in the value of their stock or a loss of dividends.  Plaintiffs cannot satisfy this basic requirement because they do not bring any claims derivatively on behalf of the Enterprises.

The Court should dismiss plaintiffs' claims.

## STATEMENT OF FACTS

### I.      History Of Fannie Mae And Freddie Mac

Congress chartered Fannie Mae and Freddie Mac to stabilize the United States home mortgage market and to promote access to mortgage credit.  *See* Compl. ¶¶ 27-28, 30, 33. Although technically private corporations, both Fannie Mae and Freddie Mac are Government-Sponsored Enterprises (GSEs) that purchase and securitize residential mortgages.  Compl. ¶¶ 28-30.  These entities, which own or guarantee trillions of dollars of residential mortgages and mortgage-backed securities, have played and continue to play a key role in housing finance and the United States economy.  *See, e.g.*, Compl. ¶¶ 27-28, 30.

From their inception as GSEs, Fannie Mae and Freddie Mac have been subject to Federal regulation and oversight, as well as Congressional authority to amend at any time the charter statutes of the Enterprises.  *See* Compl. ¶¶ 27-28, 30-32.  Congress initially chartered Fannie Mae in 1938 as a Government-held association, and later established it as a shareholder-owned

corporation in 1968.  Compl. ¶¶ 27-29.[2]  The 1968 legislation granted the Secretary of Housing and Urban Development (HUD) general regulatory authority over Fannie Mae.  *See* Compl. ¶ 28. Similarly, Congress initially established Freddie Mac in 1970 as an entity owned by the Federal Home Loan Bank Board, then reestablished it as a shareholder-owned corporation in 1989.  *See* Compl. ¶ 30; GAO-09-782 at 14-15.  Like Fannie Mae, Freddie Mac was subject to HUD's general regulatory oversight under the 1989 legislation.  GAO-09-782 at 14.

In 1992, Congress enacted the Federal Housing Enterprises Safety and Soundness Act (the Safety and Soundness Act), Pub. L. No. 102-550, §§ 1301-1395, 106 Stat. 3941-4012, legislation that not only revised regulation of the Enterprises, but also established the Office of Federal Housing Enterprise Oversight (OFHEO) to monitor their compliance with capital standards.  *See* Compl. ¶ 31; GAO-09-782 at 15-16.  In addition to OFHEO's role, HUD maintained certain regulatory authority over the Enterprises, particularly with respect to setting goals for mortgage purchases and enforcing compliance with these goals.  GAO-09-782 at 16; *see* Pub. L. No. 102-550, §§ 1301-1395, 106 Stat. 3941-4012; 12 U.S.C. §§ 4501 et seq. (2007). The Safety and Soundness Act vested OFHEO with conservatorship authority over Fannie Mae and Freddie Mac.  Compl. ¶ 31; 12 U.S.C. § 4513(b)(1).

## II.    The Housing And Economic Recovery Act Of 2008

In 2007 and 2008, both Fannie Mae and Freddie Mac began to experience increasing losses in their holdings in subprime mortgages and other mortgage-backed securities.  GAO-09-782 at 7, 28.  At the same time, the Enterprises faced a severe reduction in their ability to raise capital.  *See id.* at 28.

---

[2]  *See also* U.S. Government Accountability Office, *Fannie Mae and Freddie Mac: Analysis of Options for Revising the Housing Enterprises' Long-term Structures*, at 12-14 (Sept. 2009), http://www.gao.gov/new.items/d09782.pdf (hereinafter "GAO-09-782").

In July 2008, as the housing crisis grew, Congress passed HERA.  Pub. L. No. 110-289, 122 Stat. 2654; Compl. ¶ 32.  Through HERA, Congress transitioned regulatory oversight of Fannie Mae and Freddie Mac from OFHEO to its newly-organized successor, FHFA.  Compl. ¶ 32.  As part of this transition, Congress transferred conservatorship authority to FHFA and added authority for FHFA to (1) place the Enterprises in receivership, and (2) liquidate the Enterprises' assets.  *See* Compl. ¶ 32; 12 U.S.C. § 4617(a)(2).  As conservator or receiver, FHFA, by operation of law, "succeed[s] to . . . all rights, titles, powers, and privileges" of the Enterprises and is authorized to "take over the assets of and operate the [Enterprises] with all the powers of the shareholders, the directors, and the officers."  12 U.S.C. § 4617(b)(2)(A)(i), (B)(i).

In addition, HERA granted Treasury the authority to infuse taxpayer funds into Fannie Mae and Freddie Mac to stabilize the housing markets and the United States economy. Specifically, Treasury was permitted to purchase securities from the Enterprises to "(i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."  12 U.S.C. § 1719(a), (b).

## III.   The Government's Rescue Of Fannie Mae And Freddie Mac

The Government was called upon to rescue the Enterprises when their investment strategies left them exposed to the disintegrating housing market and declining access to capital markets.

### A.    Fannie Mae's And Freddie Mac's Financial Distress

In 2008, the Enterprises were unable to cover the credit losses tied to the significant increase in mortgage delinquencies, defaults, and foreclosures.  *See* GAO-09-782 at 7, 28; Compl. ¶ 4.  By late summer 2008, the Enterprises faced liquidity shortfalls and could not raise necessary capital as a global credit crisis dried up the financial liquidity markets.  *See id.* at 28.

The combined net losses for Fannie Mae and Freddie Mac were $5.2 billion in 2007.[3]  By September 2008, Fannie Mae and Freddie Mac already had $5.5 billion in combined net losses for the year.[4]  The Enterprises' common share prices already had plunged in the year preceding the conservatorships: Fannie Mae's stock sank 88 percent, from $62.79 on September 5, 2007, to $7.04 on September 5, 2008; Freddie Mac's stock fell 91 percent during the same period, from $60.15 to $5.10.[5]  Fannie Mae and Freddie Mac were facing serious financial difficulty, and insolvency loomed.[6]

### B. The Conservatorships And Treasury Agreements

In early September 2008, FHFA determined that the Enterprises had severe capital deficiencies and were operating in an unsafe and unsound manner.  *See* GAO-09-782 at 7, 28.  Accordingly, on September 6, 2008, after obtaining the consent of the Enterprises' boards of directors, the FHFA Director placed the Enterprises into conservatorships pursuant to 12 U.S.C. § 4617.  *See* Compl. ¶¶ 2, 40.  The conservatorship decisions focused on maintaining the Enterprises as functioning market participants.  *See* Compl. ¶ 40.

---

[3]  *See* Press Release, Fannie Mae, Fannie Mae Reports 2007 Financial Results (Feb. 27, 2008); Press Release, Freddie Mac, Freddie Mac Releases Fourth Quarter 2007 Financial Results (Feb. 28, 2008).

[4]  *See* Press Release, Fannie Mae, Fannie Mae Reports Second Quarter 2008 Results (Aug. 8, 2008); Press Release, Freddie Mac, Freddie Mac Releases Second Quarter 2008 Financial Results (Aug. 6, 2008).

[5]  *See* MarketWatch, Historical Closing Stock Price for FNMA (Fannie Mae) on Sept. 5, 2007 and Sept. 5, 2008; MarketWatch, Historical Closing Stock Price for FMCC (Freddie Mac) on Sept. 5, 2007 and Sept. 5, 2008.

[6]  Fannie Mae and Freddie Mac ultimately reported losses of $58.7 billion and $50.1 billion, respectively, for 2008.  *See* Press Release, Fannie Mae, Fannie Mae Reports Fourth-Quarter and Full-Year 2008 Results (Feb. 26, 2009); Press Release, Freddie Mac, Freddie Mac Reports Fourth Quarter and Full-Year 2008 Financial Results (Mar. 11, 2009).

Pursuant to the authority in HERA, FHFA as conservator entered into Senior Preferred Stock Purchase Agreements with the Treasury (the Stock Agreements).  *See* Compl. ¶¶ 3, 43.  In the Stock Agreements, Treasury agreed to provide each Enterprise with the funding necessary to maintain a positive net worth and thereby avoid the statutory trigger for receivership and liquidation.  Treasury made $100 billion available to support each Enterprise and backstop any capital shortfalls.  GAO-09-782 at 1 n.3.  In exchange for these capital lifelines, Treasury received $1 billion in senior preferred stock from each Enterprise, a 10-percent dividend on amounts that Treasury invested in the Enterprises, and warrants to acquire 79.9 percent of each Enterprise's common stock.  Compl. ¶¶ 3, 44-45.  Treasury has not exercised the warrants.  In May 2009, the parties amended the Stock Agreements, increasing Treasury's investment commitment to $200 billion for each Enterprise.  GAO-09-782 at 1 n.3, 9.

In August 2012, FHFA, acting as conservator for the Enterprises, entered into the Third Amendment to the Stock Agreements.  *See* Compl. ¶¶ 70-71.  The amendment was critical because of a longstanding concern that the Enterprises, although presently maintained in a solvent condition due to Treasury's assistance, failed to generate enough revenue to fund the 10-percent dividend obligation.  Moreover, the Enterprises faced enormous credit losses.[7]  The Enterprises found themselves in a death spiral: drawing on the Treasury commitment in order to pay Treasury its fixed dividend (*see* Compl. ¶¶ 51, 65), which, in turn, increased Treasury's total investment and the next quarterly dividend.[8]  This cycle would then repeat itself.  There was concern that, under the weight of the fixed dividend, the Enterprises would run through the remaining Treasury investment capacity, leading to insolvency.

---

[7] Fannie Mae, Annual Report for Fiscal Year ended Dec. 31, 2012 (Form 10-K).

[8] *See* Press Release, FHFA, Statement of FHFA Acting Director Edward J. DeMarco on Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements (Aug. 17, 2012).

Consequently, the Third Amendment eliminated the prospect of future insolvency caused by the required fixed-dividend payments.  The Third Amendment did this by eliminating the Stock Agreements' provisions requiring the payment of a fixed, 10-percent dividend that the Enterprises could not pay without further drawing on Treasury's investment commitment. Compl. ¶ 71.  Instead, the Enterprises must now pay a quarterly variable dividend – known as a "net worth sweep" – and only if the Enterprises are profitable and able to maintain capital reserves.  Compl. ¶¶ 71, 75.  If the net worth is negative in any quarter, no dividend is due. Compl. ¶ 75.  The amendment was designed to strengthen the Enterprises, decreasing their funding costs and avoiding draws on the limited backstop provided by Treasury in the Stock Agreements.  Thus, the modification maintained market stability by preserving Treasury's ability to support the continued solvency of the Enterprises and avoiding the statutory trigger for receivership and liquidation.

## IV.    Plaintiffs' Suit In This Court

Plaintiffs, owners of preferred shares in Fannie Mae and Freddie Mac, allege that the execution of the Third Amendment – between FHFA, acting as conservator, and Treasury – has taken property interests in the Enterprises' preferred stock.  *See*, *e.g.*, Compl. ¶¶ 78-84, 93-94. Specifically, plaintiffs contend that the operation of the "net worth sweep" constituted a taking by "appropriat[ing] their property without . . . just compensation."  Compl. ¶ 83; *see also id.* at ¶¶ 77, 84-85, 93-94.  The specific rights identified by plaintiffs are (1) a right to future profits in the form of a dividend; and (2) a right to a share of any liquidation surplus if the Enterprises are placed into receivership and dissolved.  Compl. ¶¶ 82-84.

# ARGUMENT

## I.     Standards Of Review

"'Jurisdiction is a threshold issue and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits.'"  *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1356 (Fed. Cir. 2003) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002)).  If the Court determines that "it lacks jurisdiction over the subject matter, it must dismiss the claim."  *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006); RCFC 12(h)(3).  In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court may consider evidentiary matters outside the pleadings.  *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985).

The Court must dismiss a complaint that does not plausibly give rise to an entitlement to relief.  RCFC 12(b)(6).  To avoid dismissal for failure to state a claim under RCFC 12(b)(6), "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief."  *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  The Court should dismiss where the complaint fails to "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim is facially implausible if it does not permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Allegations "that are 'merely consistent with' a defendant's liability" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

The purpose of RCFC 12(b)(6) "is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of

unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993) (citation omitted).  RCFC 12(b)(6), thus, "enable[s] defendants to challenge the sufficiency of complaints without subjecting themselves to discovery." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).

## II.   The Court Lacks Jurisdiction Over Plaintiffs' Complaint

Plaintiffs' claims arise out of actions, including the Third Amendment, that were taken as part of the conservatorship.  Some of those claims are also based on allegations of wrongful conduct.  Because this Court lacks jurisdiction over both challenges to conservatorship actions and claims that sound in tort, the complaint should be dismissed.

### A.   The Court Should Dismiss The Complaint Because The Complaint Is Against Actions Of The Conservator, And FHFA Is Not The United States When It Acts As Conservator

Plaintiffs allege that actions during the course of FHFA's administration of Fannie Mae and Freddie Mac in conservatorship have taken property rights in their junior preferred stock. *See, e.g.*, Compl. ¶¶ 78-85.  According to plaintiffs, FHFA's execution of the Third Amendment, and specifically the "net worth sweep" allegedly depriving plaintiffs of dividends and a theoretical liquidation surplus, constituted a taking of shareholder rights.  *Id.*  The Court should reject plaintiffs' contention that their claim can be pursued in this Court pursuant to the Tucker Act.  Plaintiffs' allegations focus on FHFA's actions as conservator and specifically on its decision to enter into the Third Amendment with Treasury.  For purposes of this Court's jurisdiction, FHFA is not the United States, and plaintiffs have no basis to challenge Treasury's actions alone.  Treasury could not have acted without FHFA, and Treasury's act of entering into a voluntary agreement with FHFA cannot form the basis of a takings claim.  Accordingly, plaintiffs' challenge in this Court must fail.

**1.      The Tucker Act Grants The Court Of Federal Claims Jurisdiction Over Claims Against The United States**

The Tucker Act establishes – and thus limits – this Court's jurisdiction.  28 U.S.C. § 1491; *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  Under the Tucker Act, the Court may only "render judgment upon any claim against the United States."  28 U.S.C. § 1491(a)(1); *see Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997).  Plaintiffs bear the burden of establishing the Court's jurisdiction and must establish that the party they are suing is, in fact, the United States.  *See Taylor v. United States*, 303 F.3d 1357, 1359-60 (Fed. Cir. 2002).

**2.      For Purposes Of The Tucker Act, FHFA Is Not The United States When Acting As Conservator For Fannie Mae And Freddie Mac**

The Court should dismiss the complaint because courts have ruled that a Government regulatory agency – acting as conservator – is not the United States.

In addressing the question of whether FHFA is a Federal actor as a consequence of placing the Enterprises into conservatorship in 2008, the District Court for the District of Columbia recently held that "FHFA as conservator of Fannie Mae is not a government actor." *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 96 (D.D.C. 2012).  Other courts have reached the same conclusion in the context of the Federal Deposit Insurance Corporation (FDIC) acting as conservator or receiver of banks.  *See O'Melveny & Myers v. Fed. Deposit Ins. Corp.*, 512 U.S. 79, 85 (1994) (FDIC acting as receiver "is not the United States"); *Ameristar Fin. Servicing Co. LLC v. United States*, 75 Fed. Cl. 807, 812 (2007) (dismissing claim because the FDIC as conservator "was not acting as the United States").

Here, FHFA, as conservator for two congressionally-chartered, private institutions, stands in the shoes of the Enterprises.  Plaintiffs' claims against FHFA and its actions as conservator are effectively claims against Fannie Mae and Freddie Mac – neither of which are alleged to be

Government entity.  This Court has jurisdiction only "to hear cases in which a plaintiff seeks just compensation for a taking under the Fifth Amendment as such a claim is 'against the United States founded . . . upon the Constitution.'"  *Souders v. S.C. Pub. Serv. Auth.*, 497 F.3d 1303, 1307-08 (Fed. Cir. 2007).  Indeed, the Fifth Amendment applies solely to Government action. "There clearly can be no taking when whatever acts complained of are those of private parties, not the government."  *See Alves v. United States*, 133 F.3d 1454, 1458 (Fed. Cir. 1998); *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995).  By suing the conservatorships, plaintiffs – the Enterprises' shareholders – are effectively suing private corporations for the decisions of their management.  Accordingly, plaintiffs' challenge to FHFA's actions as conservator must fail.

This case is similar to *Ameristar*, where plaintiff sued the FDIC under the Tucker Act for the FDIC's actions as conservator for a failed bank.  75 Fed. Cl. at 809.  The Court, relying on the Supreme Court's *O'Melveny* decision and the FDIC conservatorship statute, held that the FDIC "was not acting as the United States" when it "'stepped into the shoes'" of a bank in conservatorship.  *Id.* at 812.  The Court dismissed the complaint because Ameristar's claims were between two non-governmental entities and the FDIC was "not the United States" for purposes of the Tucker Act.  *Id.*

This principle applies equally to FHFA, which operates pursuant to a conservatorship statute, patterned after the FDIC statute, that authorizes FHFA to "step[] into the shoes" of the Enterprises.  *See Herron*, 857 F. Supp. at 94.  "Thus, like FDIC when it serves as a conservator or receiver of a private entity, FHFA when it serves as conservator 'step[s] into the shoes' of the

private corporation." *Id.*[9]  Because FHFA as conservator does not act as the United States, the Court should dismiss plaintiffs' allegations insofar as the complaint challenges the actions of FHFA as conservator for entering into the Third Amendment.  *See Ameristar*, 75 Fed. Cl. at 812; *see also I.M. Frazer v. United States*, 288 F.3d 1347, 1354 (Fed. Cir. 2002) (quoting *O'Melveny*, 512 U.S. at 85); *Ambase v. United States*, 61 Fed. Cl. 794, 796-97 (2004) (claim that FDIC mismanaged receivership is not a claim against the Government); *AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 534 (2003) (as receiver, "the FDIC's attendant role herein is tantamount to that of a private party and not the government *per se*.").

Because plaintiffs cannot maintain their claims against FHFA, this case must be dismissed.  Plaintiffs have no basis to challenge the actions of Treasury alone.  FHFA decided, on behalf of the Enterprises, to enter into the Third Amendment.  Treasury, acting as the United States, was counterparty to that voluntary agreement.  A voluntary agreement is "not a proper basis upon which to premise a takings claim."  *See Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005).  Treasury, alone, could not and did not take anything from the plaintiffs, unilaterally or otherwise.  Treasury, alone, could not impose any "net worth sweep" on the Enterprises and plaintiffs do not allege that Treasury coerced or compelled FHFA to enter into the Third Amendment.  FHFA acted as a private corporation when it entered into the Third

---

[9]  The FDIC's conservatorship statute authorizes the FDIC, as conservator, to "succeed to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution . . . ." 12 U.S.C. § 1821(d)(2)(A)(i). Similarly, FHFA's enabling statute authorizes the agency, as conservator, to "immediately succeed to . . . all rights, titles, powers, and privileges of [the Enterprises], and of any stockholder, officer, or director . . . ." 12 U.S.C. § 4617(b)(2)(A).

Amendment with Treasury; because there is no jurisdiction over FHFA's actions, there is no jurisdiction over plaintiffs' claims.[10]

### B.    The Court Lacks Jurisdiction To Entertain Plaintiffs' Challenge To FHFA's Discretion As Conservator

The Tucker Act expressly precludes the Court from exercising jurisdiction over claims sounding in tort.  28 U.S.C. § 1491(a)(1).  Thus, the Tucker Act cannot support a takings claim based on allegations that a Government agency abused its discretion.  Because the plaintiffs' claims allege that, while the Enterprises are operating in conservatorships, FHFA has improperly exercised its discretion with respect to the execution of the Third Amendment and the declaration of dividends, the Court should reject the claims.

This Court's predecessor reached a similar conclusion when considering bank investors' takings claim after the Comptroller of the Currency placed the investors' bank into receivership. In *Golden Pacific Bancorp v. United States*, 25 Cl. Ct. 768, 769-70 (1992), *aff'd*, 15 F.3d 1066 (Fed. Cir. 1994), the court clarified that, pursuant to the Tucker Act, plaintiffs could not challenge the propriety of the Comptroller's exercise of discretion because such an allegation would sound in tort.  *Id.* at 770 n.2.

Similarly, in *Sharp v. United States*, 566 F.2d 1190, 215 Ct. Cl. 883, 883-84 (Ct. Cl. 1977), the plaintiffs claimed that the FDIC's "over-regulation" of their bank resulted in a taking. Among other things, the plaintiffs alleged that the FDIC acted beyond its statutory authority when it transferred bank assets and demanded that the bank's directors close the bank.  *Id.*  The Court of Claims held that it lacked jurisdiction over these allegations because the Tucker Act precludes claims sounding in tort.  *Id.* at 886.  The court then noted the significant jurisdictional

---

[10]    In addition and independently, as explained below, because Treasury acted as the United States in its commercial or proprietary capacity with respect to the Third Amendment, plaintiffs fail to state any takings claim against Treasury.

hurdles a plaintiff must overcome to challenge an action by a Federal bank regulator in this Court:  on one hand, if the challenged action in conservatorship is permitted by the applicable statute, there can be no regulatory taking (*see also*, Section IV.B, below); on the other hand, if the action is *not* permitted by statute, "the plaintiff's claim must necessarily sound in tort."  *Id.* at 885-86.   Thus, regardless of how plaintiffs construct their pleading, they cannot state a claim over which this Court has jurisdiction.

The Court drew this same distinction in *Franklin Savings Corporation v. United States*, 46 Fed. Cl. 533, 535-37 (2000), emphasizing that challenges to the judgment of Federal regulators are not only tortious in character – and thus beyond the Court of Federal Claims' jurisdiction – but also are protected by the discretionary function exception to the Federal Tort Claims Act.  *See* 28 U.S.C. § 2680(a).  This means that no matter how a plaintiff attempts to state its claim, "'just compensation' for a taking is not an available remedy" in the context of actions taken by bank regulators that happen to affect shareholder interests.  *Franklin*, 46 Fed. Cl. at 537.

Here, plaintiffs make the same kind of tort-like allegations that this Court rejected in *Sharp* and *Franklin Savings*, asserting that FHFA exceeded its regulatory authority as conservator when it executed the Third Amendment's "net worth sweep" provisions.  Plaintiffs contend that the Third Amendment "was not the result of an arms-length agreement."  Compl. ¶ 12.  Instead, according to plaintiffs, "the Government made an agreement with itself to appropriate private property for the benefit of the Treasury" and the Third Amendment is "nothing other than the unilateral appropriation for the benefit of the U.S. Treasury of all the economic rights previously held by the Junior Preferred Stockholders.  *Id.*

Given these allegations, plaintiffs' takings claim necessarily asserts that that FHFA exceeded its statutory authority, abused its discretion, or committed some sort of malfeasance.

17

But if, as plaintiffs allege, FHFA exceeded its statutory authority or abused its discretion with respect to dividends,[11] the claim is properly one in tort. Thus, the Tucker Act expressly precludes the Court from exercising jurisdiction over the complaint. *Golden Pacific*, 25 Cl. Ct. at 770 n.2; *Adams v. United States*, 20 Cl. Ct. 132, 138-39 (1990); *see also Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (no jurisdiction over professional negligence claim); *Brown*, 105 F.3d at 623 (no jurisdiction over fraud claim); *De-Tom Enters., Inc. v. United States*, 552 F.2d 337, 339 (Ct. Cl. 1977) (finding no jurisdiction to entertain wrongful coercion claim in a takings case).

## C.      The Complaint Should Be Dismissed Under 28 U.S.C. § 1500

Although Federal Circuit precedent currently provides otherwise, plaintiffs' complaint should be dismissed for lack of jurisdiction under 28 U.S.C. § 1500.

Section 1500 provides that this Court "shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person . . . acting or professing to act . . . under the authority of the United States."  28 U.S.C. § 1500.  Based on the statute's language and purpose, this case should fall squarely within this jurisdictional bar.  The Supreme Court has explained that "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1731 (2011).  Here, each of the three sets of plaintiffs, whose complaints in this Court were consolidated into this action, also filed a

---

[11]  According to the Certificates of Designation issued with plaintiffs' preferred shares, Compl. ¶¶ 36-39, the payment of dividends is a matter within the "sole discretion" of the Enterprises' Boards of Directors. *See, e.g.*, http://fanniemae.com/resources/file/ir/pdf/stock-info/Series_Q_10012007.pdf.  (Holders of preferred stock are entitled to receive a quarterly dividend "when , as and if declared by the Board of Directors of Fannie Mae . . . in its sole discretion out of funds legally available therefor . . . .").

complaint in the United States District Court for the District of Columbia within three weeks after filing in this Court.  *Cacciapalle v. Fed. Nat'l Mortgage Assoc.*, No. 13-1149, Compl. (D.D.C. July 29, 2013)(filed in this Court on July 10, 2013); *American European Ins. Co. v. Fed. Nat'l Mortgage Assoc.*, No. 13-1169, Compl. (D.D.C. July 30, 2013)(filed in this Court on July 19, 2013); and *Dennis v. FHFA*, No. 13-1208, Compl. (D.D.C. Aug. 5, 2013)(filed in this Court on August 5, 2013).[12]

All of the complaints filed by plaintiffs in this consolidated action state related claims for purposes of Section 1500.  *See Tohono O'Odham Nation*, 131 S. Ct. at 1728.  Each plaintiff's district court suit, like this suit, seeks to recover damages allegedly suffered as a result of the Third Amendment.  Nevertheless, because some of the plaintiffs happened to file their District Court complaint after, rather than before, their complaint in this Court, a disputed chain of precedent appears to say that this Court can accept jurisdiction notwithstanding the clear import of Section 1500.  In *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), the Court of Claims – facing a plaintiff's argument that a belated filing in district court ousted this Court's predecessor of jurisdiction to dismiss its long-standing claims with prejudice – created an exception to Section 1500, holding that the statute applies "only when the suit shall have been

---

[12]    Indeed, the *Dennis* complaints were filed on the same day.  The cover sheet for the *Dennis* complaint filed in this Court bears a time stamp indicating that it was received at 4:33 p.m. on August 5, 2013.  The *Dennis* district court complaint does not indicate what time it was filed.  Even if plaintiffs could prove that the *Dennis* district court complaint was filed after 4:33 p.m. on August 5, 2013, the Court of Federal Claims has – notwithstanding a split in its decisions – persuasively explained that "same-day filings in a district court are *per se* pending for the purposes of § 1500, and the order of filing of the two complaints on the day in question is of no consequence."  *Passamaquoddy Tribe v. United States*, 82 Fed. Cl. 256, 268 (2008) *aff'd*, 426 F. App'x 916 (Fed. Cir. 2011); *but see United Keetoowah Band of Cherokee Indians in Oklahoma v. United States*, 104 Fed. Cl. 180, 182 (2012) (recognizing split of opinions within the Court of Federal Claims on the question).

commenced in the other court before the claim was filed in this court for failure to prosecute." *Id.* at 949.

The *en banc* Federal Circuit repudiated *Tecon*'s order-of-filing rule in *UNR Industries, Inc. v. United States*, 962 F.2d 1013 (Fed. Cir. 1992), describing *Tecon* as "an aberrational case which stands astride the path to a proper interpretation of section 1500 as it pertains to a post Claims Court filing in another court."  *Id.* at 1023; *accord id.* at 1022 ("Congress wanted not to dictate the order in which a claimant files suits in the Claims Court and another court on the same claim, but to discourage him from doing so altogether.").  But the Supreme Court granted *certiorari* and affirmed the Federal Circuit's decision on other grounds, vacating the *UNR Industries* court's order-of-filing holding and expressly reserving the issue.  *United States v. Keene Corp.*, 508 U.S. 200, 209 n.4 (1993).

Later, in *Tohono O'Odham Nation*, the Supreme Court cast serious doubt on the continuing validity of *Tecon's* order-of-filing rule, describing it as "Circuit precedent that has left the statute without meaningful force."  131 S. Ct. at 1729.  At least one judge on the Federal Circuit likewise has questioned its wisdom.  *See, e.g., Brandt v. United States*, 710 F.3d 1369, 1382 (Fed. Cir. 2013) (Prost, J., concurring) (applying *Tecon* as binding precedent but urging the court to "take this opportunity to overrule *Tecon* and finally dispense with the ill-conceived order-of-filing rule").  Given the unstable statutory foundation of *Tecon* and the strength of the recent decisions questioning the order-of-filing rule, the Court should not condone plaintiffs' effort to avoid Section 1500 and needlessly subject the United States to redundant litigation.  The Court should dismiss the complaint.

**III.**     **Plaintiff Shareholders Lack Standing To Bring Suit**

A party invoking Federal jurisdiction must establish standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  A plaintiff must show that it has suffered a concrete and particularized "injury in fact," that is "actual or imminent, not conjectural or hypothetical," and fairly traceable to the defendant's challenged conduct.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

The Court should dismiss the complaint because plaintiffs, shareholders in the Enterprises, lack standing to bring suit for two distinct reasons.  Plaintiffs are first precluded from bringing suit under HERA, which grants FHFA exclusive authority to act on behalf of shareholders of the Enterprises when the entities are in conservatorship.  Courts have repeatedly recognized that shareholders of the Enterprises cannot bring derivative suits and, there is no basis for distinguishing direct or individual suits.  Moreover, as a matter of common law, because plaintiffs seek only to recover a loss of share value allegedly resulting from Government action, plaintiffs lack individual standing to sue.

**A.**     **Plaintiffs Lack Standing To Sue Because HERA Expressly Provides That FHFA Succeeded To All Shareholder Rights**

Because FHFA statutorily succeeded to all shareholder rights – including the right to sue for compensation or damages – the Court should dismiss plaintiffs' claims, which are expressly based on their role as shareholders.

It is undisputed that FHFA placed Fannie Mae and Freddie Mac into conservatorships in 2008.  Compl. ¶ 43.  Plaintiffs concede that this decision was "pursuant to the authority and requirements of HERA."  *Id.*  FHFA, upon appointment as conservator, immediately succeeded, "by operation of law" to "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder . . . with respect to the regulated entity and the assets of the regulated entity."  12

U.S.C. § 4617(b)(2)(A)(i).  This unambiguous language demonstrates Congress's intent to delegate to the conservator exclusive authority to sue on behalf of shareholders, without exception.

Courts have routinely recognized this exclusive authority.  Because HERA expressly grants all shareholder rights and powers to FHFA, courts have allowed FHFA to substitute for Fannie Mae and Freddie Mac shareholder plaintiffs seeking to sue derivatively on behalf of the Enterprises.  *See, e.g.*, *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012) (FHFA permitted to substitute for shareholders in derivative suit against Fannie Mae directors and officers); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790 (E.D. Va. 2009), *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. FHFA*, 434 Fed. App'x. 188 (4th Cir. 2011) (shareholders lacked standing to bring derivative suit on behalf of corporation because all rights and powers were transferred to FHFA); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 350 (S.D.N.Y. 2009) ("the plain language of HERA requires the substitution of the FHFA" in place of shareholder plaintiffs).

Plaintiffs, unlike the shareholder plaintiffs in *Kellmer*, *Federal Home Loan Mortgage Corp.*, and *Sadowsky*, do not seek to sue derivatively on behalf of the Enterprises.  Indeed, plaintiffs acknowledge that they seek compensation based on their status as individual shareholders.  The reasoning of the cases addressing shareholder derivative suits is directly applicable here, however, because HERA, in granting FHFA all shareholder rights, makes no distinction between individual and derivative rights sought to be asserted by shareholders.[13] Instead, the statute expressly confers on FHFA "*all* rights, titles, powers, and privileges" of shareholders.  12 U.S.C. § 4617(b)(2)(A)(i) (emphasis added).

---

[13]  To date, no court has considered whether HERA permits the Enterprises' shareholders to bring an individual, as opposed to derivative, suit.

In this case, HERA's effect is clear, particularly when the Court considers that the true nature of plaintiffs' claim is not a taking (after all, plaintiffs still retain their preferred shares, which continue to be bought and sold as any other equity), but a demand for compensation for shareholder dividends that plaintiffs believe the Enterprises should have declared, as well as a related liquidation preference. *See* Compl. ¶ 61, 84.  In other words, plaintiffs' real complaint is that Fannie Mae and Freddie Mac should start paying junior preferred shareholders a dividend because the Enterprises are profitable.  Alternatively, they seem to claim that all earnings should be retained in order to create a surplus to be distributed in the event of liquidation.  But in light of HERA, plaintiffs certainly cannot sue to compel the payment of a shareholder dividend or the creation of a liquidation surplus.  Because FHFA, rather than the Enterprises' shareholders, possesses sole authority to enforce shareholder rights, the Court should dismiss plaintiffs' complaint.

> ### B.     Shareholders Lack Standing To Bring Claims Based Upon An Alleged Loss Of Share Value Or Dividends

Shareholders do not possess standing to sue for the loss of stock value or rights to dividends.  *See Robo Wash, Inc. v. United States*, 223 Ct. Cl. 693, 696-97 (1980).  Courts have regularly concluded that a "depreciation or diminution in the value of a shareholder's corporate stock" is not "the type of direct, personal injury which is necessary to sustain a direct cause of action."  *Hometown Fin., Inc. v. United States*, 56 Fed. Cl. 477, 486 (2003) (quoting *Gaff v. Fed. Deposit Ins. Corp.*, 814 F.2d 311, 315 (6th Cir. 1987), *aff'd*, 409 F.3d 1360 (Fed. Cir. 2005)); *see also Sobchack v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 17 F.3d 600, 606-07 (2d Cir. 1994) (shareholders lacked standing to bring direct claim for contractual rights to receive dividend payments).  This Court has consistently held that "shareholders lack standing to sue in their individual capacities where their losses from the alleged injury to the

corporation amount to nothing more than a diminution in the value of their stock or a loss of dividends." *Holland v. United States*, 59 Fed. Cl. 735, 740 (2004) (citing *Hometown*, 56 Fed. Cl. at 486); *Statesman Sav. Holding Corp. v. United States*, 41 Fed. Cl. 1, 16 (1998).

"A diminution in the value of corporate stock resulting from some depletion of or injury to corporate assets is a direct injury only to the corporation; it is merely an indirect or incidental injury to an individual shareholder." *Hometown*, 56 Fed. Cl. at 486 (quoting *Gaff*, 814 F.2d at 315). Individual suits are not permitted because they are merely attempts by shareholders to ignore the separate corporate existence of entities, like the Enterprises, and recover what rightly belongs, if proven, to the entities themselves. *See Hometown*, 56 Fed. Cl. at 486; *see also In re Ionosphere Clubs, Inc.*, 17 F.3d at 606.

Here, plaintiffs lack standing to bring a direct claim because the harm they allege is a loss of share value, namely the loss of profits available to pay preferred shareholders a dividend. *See* Compl. ¶¶ 78-79.[14] As described above, however, courts generally view this type of harm as an injury to a corporation that may only be asserted by shareholders derivatively, rather than directly. In such circumstances, the pursuit of a remedy belongs to the corporation; if the corporation fails or refuses to assert a claim of injury on its own behalf, the "proper remedy" is not a direct claim by shareholders – as plaintiffs pursue here – but "a 'derivative action' . . . brought by a shareholder in the name or right of the corporation to redress an injury sustained by, or to enforce a duty owed to, the corporation." 13 *Fletcher Cyclopedia of the Law of Corporations* § 5939 (rev. ed. 2013).

---

[14] As discussed below in Section IV.B, plaintiffs do not – and cannot – allege that they possess an unqualified right to the payment of dividends. At most, plaintiffs possess a right to share in dividends only if and when the Boards of Directors declare a dividend for junior preferred shareholders. *See* Compl. ¶¶ 36, 37. Since being placed into conservatorships in September 2008, the Enterprises have not declared a dividend on junior preferred stock; it must follow, therefore, that plaintiffs' asserted dividend rights have not been violated.

Plaintiffs do not, of course, pursue a derivative claim because all rights and powers to do so belong to FHFA.  Because plaintiffs attempt to assert claims that rightfully belong to the Enterprises, they lack standing.  The Court should dismiss the complaint on this basis.

**IV.    Plaintiffs Fail To State A Viable Takings Claim**

Even if plaintiffs could (1) establish jurisdiction over the actions taken by the conservator, and (2) establish standing, the Court should dismiss plaintiffs' complaint for failure to state a takings claim.

The Fifth Amendment states that "private property [shall not] be taken for public use without just compensation."  U.S. Const. amend. V.  The Federal Circuit has established a two-part test to consider whether a plaintiff has stated a compensable Fifth Amendment taking:  the Court (1) first determines whether the plaintiff has identified a cognizable property interest; and (2) then determines whether Government action amounted to a taking of the property interest. *See, e.g.*, *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377-78 (Fed. Cir. 2008); *Am. Pelagic Fishing Co, L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).

 Further, the Supreme Court has recognized only two types of takings, neither of which has occurred here.  The first occurs through the Government's physical invasion or appropriation of private property.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014-15 (1992); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982).  Second, a taking can also occur through Government regulations that unduly burden private property interests.  *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  Because plaintiffs do not allege a physical taking of their property, the complaint can only be understood to allege, at best, a regulatory taking.  Moreover, the Government cannot be liable for a taking when it acts as a market participant in its

proprietary capacity, rather than as the sovereign.  As demonstrated below, plaintiffs' allegations in this case do not satisfy even the most basic elements of a regulatory taking.

A.   **Treasury Cannot Be Subject To Takings Liability Because The Third Amendment Was Executed By The Government Acting As A Market Participant Rather Than A Sovereign**

Plaintiffs do not allege any action or conduct by the United States that triggers an obligation to provide compensation under the Fifth Amendment.  They instead base their claims upon Treasury's contract with FHFA, acting on behalf of the Enterprises as conservator.  *See* Compl. ¶¶ 45-51.  The Court should dismiss the complaint because takings claims cannot be premised upon Government action undertaken in a proprietary or commercial capacity.  *See*, *e.g.*, *Alaska Airlines v. Johnson*, 8 F.3d 791, 798 (Fed. Cir. 1993).  When it chose to modify the Stock Purchase Agreements by executing the Third Amendment (and indeed when it chose to invest in the Enterprises in the first place), Treasury was merely a commercial actor.  Thus, execution of the Third Amendment could not have triggered any Constitutional obligations under the Fifth Amendment.

1.   **Courts Distinguish Between Sovereign And Proprietary Acts**

The Federal Circuit has long recognized a distinction between actions of the Government as sovereign and actions undertaken in a commercial or proprietary capacity.  When the United States "comes down from its position of sovereignty and enters the domain of commerce" it acts "in its proprietary capacity and not in its sovereign capacity."  *Sun Oil Co.v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978); *see also Branch Banking & Trust Co. v. United States*, 98 F. Supp. 757, 766 (Ct. Cl. 1951) (possibility of estoppel in Government contracting because the United States is acting in its proprietary capacity); *Cox v. Kurt's Marine Diesel of Tampa, Inc.*, 785 F.2d 935, 936 (11th Cir. 1986) ("in its proprietary capacity the government's activities are analogous to those of a private concern").

The Government's powers to condemn and regulate private property are uniquely sovereign. The "scope of the 'public use' requirement of the Takings Clause is coterminous with the scope of a sovereign's police powers." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014 (1984) (internal quotes omitted). The Takings Clause of the Fifth Amendment can require compensation when the Government exercises such sovereign powers. *See, e.g.*, *Lingle*, 540 U.S. at 537. Conversely, where the Government "comes down from its position of sovereignty and enters the domain of commerce," the Government participates in the marketplace in the same manner as a private party and the Takings Clause has no role. *Sun Oil*, 572 F.2d at 818; *see also St. Christopher Assocs., LP v. United States*, 511 F.3d 1376, 1385 (Fed. Cir. 2008); *Alaska Airlines*, 8 F.3d at 798; *but see Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed. Cir. 1983) (discussing in *dicta* the sovereign-proprietary distinction). Moreover, when the Government participates in the marketplace, it acts in its proprietary capacity regardless of the public policy objectives underlying its action. *St. Christopher Assocs.*, 511 F.3d at 1385 (In making HUD loans, Government acted in proprietary capacity notwithstanding objective to provide affordable housing); *see also United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 737 (1979) (Government deemed an ordinary lender notwithstanding public/welfare objectives).

**2.      Plaintiffs' Takings Claims Against Treasury Are Based Solely On Proprietary Acts**

Plaintiffs base their claims upon Treasury's contracts. *See* Compl. ¶¶ 45-51. Because the Government action described in the complaint was undertaken in a proprietary capacity, and, indeed, was the sort of arrangement that a private party might demand in similar circumstances, the Court should dismiss the complaint for failure to state a claim upon which relief can be granted. *See St. Christopher Assocs.*, 511 F.3d at 1385 ("[T]akings claims do not arise [where] the government is acting in its proprietary rather than its sovereign capacity."); *Alaska Airlines*, 8

F.3d at 798 (holding that "actions . . . taken in apparent good faith in the government's proprietary capacity, not in its sovereign capacity . . . did not constitute a taking"); *Sun Oil*, 572 F.2d at 818 (rejecting plaintiff's takings claim where the United States acted "in a proprietary capacity rather than a sovereign capacity").

Further, plaintiffs do not take issue with Treasury's decision to invest in the Enterprises in 2008, when they were in dire financial straits. Nor do plaintiffs take issue with Treasury's investment of hundreds of billions of dollars pursuant to a contract that guaranteed the taxpayers a return on the investment in the form of dividends, a liquidation preference, and a periodic commitment fee. Compl. ¶¶ 45-51. The sole focus of plaintiffs' complaint is a 2012 contract amendment that altered the terms of the commercial transaction between Treasury and the Enterprises. Compl. ¶¶ 83-86, 93. That amendment, however, does not alter the fundamental commercial nature of the transaction between Treasury and the Enterprises. The United States – like a private investor – can have no takings liability to the Enterprises' shareholders for a purely commercial transaction undertaken by the Enterprises and Treasury.

Here, according to plaintiffs' own complaint, Treasury merely invested funds into the Enterprises in exchange for a return on the investment. The Government's actions were, therefore, purely commercial. Consequently, the complaint should be dismissed.

### B. Plaintiffs' Ownership Of Shares In The Enterprises Does Not Create A Legally Cognizable Property Interest For Purposes Of A Takings Claim

Plaintiffs' allegations that the Government took their dividend and liquidation rights do not identify a legally cognizable property interest for purposes of a takings claim. This is because of the longstanding regulatory authority of FHFA and its predecessor, OFHEO, to place the Enterprises into conservatorships and manage the Enterprises' assets. This limitation

necessarily limits plaintiffs' rights as shareholders and prevents plaintiffs from asserting a legally cognizable property interest in Fannie Mae's and Freddie Mac's profits or other assets.

Property interests are, for takings purposes, limited by the statutory and regulatory framework in existence when the property was acquired.  This legal framework inheres in the property, negating any Fifth Amendment taking when the Government acts within the framework.  *See, e.g.*, *Acceptance*, 583 F.3d at 857-58; *Bair v. United States*, 515 F.3d 1323, 1327-29 (Fed. Cir. 2008); *Am. Pelagic*, 379 F.3d at 1379-81; *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed Cir. 1995).

Consistent with this principle, the Federal Circuit has held in a series of cases that shareholders do not articulate a cognizable property interest in shares of banks in conservatorship or receivership because the laws authorizing conservatorship and receivership actions inhere in, and limit, rights in the shares.  *See Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073-74 (Fed. Cir. 1994); *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 957 (Fed. Cir. 1992), *cert. denied*, 113 S. Ct. 324 (1992); *see also Am. Cont'l Corp. v. United States*, 22 Cl. Ct. 692, 701 (1991).  Specifically, regulated financial institutions lack "the fundamental right to exclude the government from [their] property"; therefore, the plaintiffs "held less than the full bundle of property rights."  *See Golden Pacific*, 15 F.3d at 1073-74 (quoting *Cal. Hous. Sec.*, 959 F.2d at 958).

The holdings and reasoning from these bank cases are directly applicable here.  Plaintiffs allege that the August 2012 Third Amendment to the Stock Agreements expropriated plaintiffs'

dividend and liquidation rights.  Compl. ¶ 77.  Plaintiffs do not (and cannot) allege that the Government took their shares, which continue to have value and to be traded.[15]

Under the statutory framework applicable to the Enterprises, however, a conservatorship and the actions taken by the conservator cannot affect or take any cognizable property interest in plaintiffs' shares because there is no cognizable property interest.  Since their inception, the Enterprises have been subject to Federal oversight and regulation.  In particular, Fannie Mae and Freddie Mac have been subject to appointment of a conservator, first under the Safety and Soundness Act, 12 U.S.C. § 4619, and more recently under HERA, 12 U.S.C. § 4617.  Compl. ¶¶ 31, 32.  Congress granted FHFA the authority, with or without the consent of the Enterprises or their shareholders, to appoint a conservator "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."  12 U.S.C. § 4617(a)(2).  The same holds true for the actions taken by FHFA as conservator.  In HERA, Congress authorized FHFA to take over the assets and conduct the business of the Enterprises, with all the powers of shareholders, directors, and officers.  12 U.S.C. § 4617(b)(2).  FHFA's statutory authority includes the authority to "transfer or sell any asset or liability" of the Enterprise.  12 U.S.C. § 4617(b)(2)(G).  Not only does HERA give FHFA the authority to operate the Enterprises, the statute broadly authorizes FHFA to take any action that FHFA determines to be in the best interests of the Enterprises.  12 U.S.C. § 4617(b)(2)(J).

Therefore, plaintiffs' rights as preferred shareholders were and are subject to the statutory right of the Federal Government, if determined necessary, to place and operate the Enterprises in conservatorship.  These applicable statutes, as well as regulations promulgated pursuant to these statutes, are "background principles" of Federal law that inhere in plaintiffs' property interests as

---

[15]  *See* Stock Price – Fannie Mae, http://www.morningstar.com/invest/stocks/82682-fnma-fannie-mae.html; *see also* Compl. ¶ 43.

shareholders. *See Acceptance*, 583 F.3d at 857-58; *Bair*, 515 F.3d at 1327-28; *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003).[16]

For this reason, plaintiffs cannot establish a cognizable property interest necessary for a takings claim. To the contrary, plaintiffs' alleged property rights are nearly identical to those rejected in *Golden Pacific* and *California Housing Securities*. The bank in *Golden Pacific* was subject to the regulatory authority of the Comptroller; the savings and loan in *California Housing Securities* was subject to regulation by the Office of Thrift Supervision (OTS). Here, the Enterprises' regulator is FHFA. Like the regulators in *Golden Pacific* and *California Housing Securities*, FHFA possessed the statutory right to step in and place the Enterprises into conservatorships, and this right inhered in plaintiffs' shares. As shareholders in regulated financial institutions, plaintiffs do not possess the right to exclude others, and specifically the right to exclude Federal regulators. *See Golden Pacific*, 15 F.3d at 1073-74. Moreover, plaintiffs chose to invest in regulated entities. *See id.* at 1073 ("Golden Pacific voluntarily entered into the highly regulated banking industry by choosing to invest in the Bank."). For these reasons, plaintiffs' asserted property interests are non-cognizable and non-compensable for purposes of a taking.

In *Golden Pacific* and *California Housing Securities*, there was no taking because neither the bank nor its shareholders could exclude Government regulators from the banks and bank

---

[16]   Even if plaintiffs acquired some of their shares prior to enactment of the Safety and Soundness Act (1992), a fact that plaintiffs do not allege in their complaint, they could not have reasonably expected that the Enterprises would never be subject to the provisions in the Act or, for that matter, the provisions in HERA. *See Branch*, 69 F.3d at 1582; *Golden Pacific*, 15 F.3d at 1074; *Cal. Hous. Sec.*, 959 F.2d at 959; *Am. Cont'l Corp.*, 22 Cl. Ct. at 697 ("when an investment is made in such a highly regulated industry, to be reasonable, expectations must be based not only on then-existing federal regulations but also on the recognition that there may well be related changes in the regulations in the future"); *but see Palazzolo v. R.I.*, 533 U.S. 606 (2001) (in the context of real property, the state may not avoid paying compensation merely because the property owner purchased after the regulation was enacted).

assets.  *Golden Pacific*, 15 F.3d at 1074.  In other words, the investors in the banks did not possess the property right that they alleged had been taken when the Government regulator (the Comptroller) seized the bank and placed it into receivership.

Here, plaintiffs assert that the Government took their shareholder rights to a dividend. Yet shareholders in Fannie Mae and Freddie Mac do not possess an unfettered right to a dividend.  In fact, under HERA and the Stock Agreements, plaintiffs have no right to expect that FHFA, as conservator, will act in any particular fashion when managing the Enterprises.  12 U.S.C. § 4617; *see also, e.g.*, http://fanniemae.com/resources/file/ir/pdf/stock-info/Series_Q_10012007.pdf.  FHFA possesses authority to manage the Enterprises' earnings or assets during the conservatorships, and shareholders do not have the right to exclude FHFA from that management.  Addressing plaintiffs' claim head on, shareholders do not possess the right to moneys that they believe should be paid out to them as a dividend.  Given plaintiffs' failure to articulate a legally cognizable property interest, the Court should dismiss the complaint.

## C.     Plaintiffs Have Not Alleged The Facts Necessary For A Taking

Even if conservatorship of a regulated financial institution could give rise to a takings claim, which it cannot, plaintiffs fail to explain how the Government's actions could be a taking under the Fifth Amendment.  Because plaintiffs do not allege a physical taking of their property, the complaint can only be understood to allege, at best, a regulatory taking.  We demonstrate below, however, that plaintiffs fail to state a claim for a regulatory taking.[17]

---

[17]  The Federal Circuit has held that the Government's placing a financial institution into conservatorship or receivership does not give rise to a physical taking.  *See Cal. Housing Sec.*, 959 F.2d at 958.  More broadly, the regulatory seizure of a financial institution is not a physical taking.  *Branch*, 69 F.3d at 1576; *see also Golden Pacific*, 15 F.3d at 1073-74.

1.      **Plaintiffs Cannot Plausibly Allege A Categorical Regulatory Taking**

Plaintiffs have not alleged a valid regulatory taking, either under a categorical or balancing analysis.  Under a categorical, or "total wipeout," theory, a taking may be established by showing that a "regulation denies all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015.  The Supreme Court, however, has explained that the categorical takings analysis introduced by *Lucas* applies only in the "relatively rare" and "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.* at 1017-18 (emphasis in original).  "The categorical rule . . . applied in *Lucas* states that compensation is required when a regulation deprives an owner of '*all* economically beneficial uses' of his land." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (emphasis in original) (quoting *Lucas*, 505 U.S. at 1019).

*Lucas* is therefore applicable only to allegations regarding real property. *See Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007) ("*Lucas* protects real property only."); *see also Branch*, 69 F.3d at 1576 (finding, based on *Lucas*, that principles of takings law applicable to real property do not apply to statutes imposing monetary liability). Plaintiffs have made no allegations relating to land in this case.

In addition, *Lucas* requires a deprivation of all beneficial use of property. *Lucas,* 505 U.S. at 1019.  Thus, even if the reasoning in *Lucas* were extended to the facts of this case, plaintiffs cannot establish a "total wipeout" of their property.  Indeed, notwithstanding the execution of the Stock Agreements, including the Third Amendment, plaintiffs still own their preferred shares, the shares retain value as traded equities, and the share prices have fluctuated since FHFA placed

the Enterprises into conservatorships.[18]  Thus, the shares still retain much of their beneficial use,

and plaintiffs cannot establish a "total wipeout" of share value.

2.    <b><u>Plaintiffs Cannot Establish A <i>Penn Central</i> Regulatory Taking</u></b>

If the alleged regulatory taking is not a *Lucas*-type categorical taking, the proper test for

determining whether a taking has occurred was established by the Supreme Court in *Penn*

*Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978).  *See Cienega*

*Gardens v. United States*, 331 F.3d 1319, 1337 (Fed. Cir. 2003).  The *Penn Central* inquiry looks

at three factors: (1) the economic impact of the regulation, (2) the extent to which the regulation

interferes with investment-backed expectations, and (3) the nature or character of the

governmental action.  *Id.* (citation omitted).  Failure to meet one of the three factors is usually

fatal to a *Penn Central* takings claim.  *Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 511

(2009).  Here, plaintiffs fail to explain how the conservatorship of the Enterprises could satisfy

any of the *Penn Central* factors.  Thus, the Court should dismiss plaintiffs' takings claims.

First, plaintiffs have failed to allege that Government action resulted in economic impact

upon their dividend or liquidation rights; instead, they acknowledge that Treasury has been

required to infuse $188 billion of capital into the Enterprises to address their insolvency.

Compl. ¶¶ 4, 52-59.  Thus, because plaintiffs have not alleged, nor can they, that they are worse

off as a result of the conservatorships than they would have been had the conservatorships not

been imposed, dismissal of the complaint is required.  *Seiber v. United States*, 364 F.3d 1356,

1370 (Fed. Cir. 2004) ("the existence of economic injury is indispensable to demonstrating a

regulatory taking") (citation omitted).

---

[18]  *See* Stock Price – Fannie Mae, http://www.morningstar.com/invest/stocks/82682-fnma-fannie-mae.html.

With respect to the second *Penn Central* factor, the Federal Circuit has held that regulatory agencies do not interfere with the reasonable investment-backed expectations of owners and shareholders when the regulators place a financial institution into conservatorship or receivership. *Golden Pacific*, 15 F.3d at 1074; *Cal. Hous. Sec.*, 959 F.2d at 958-59; *see also Am. Cont'l Corp.*, 22 Cl. Ct. at 697. Stated differently, the Government's exercise of its long standing authority to place a regulated financial institution into receivership and liquidate it, or to take actions short of receivership, like placing the Enterprises into conservatorship and taking authorized actions during that conservatorship, cannot give rise to a "taking." *See Golden Pacific*, 15 F.3d at 1074; *Cal. Hous. Sec.*, 959 F.2d at 958-59.

The Court of Appeals summarized the reasonable expectations of a regulated financial institution in *Golden Pacific*:

> Put most simply, Golden Pacific could not have reasonably expected that the government "would fail to enforce the applicable statutes and regulations." Indeed, Golden Pacific's expectations could only have been that the FDIC would exert control over the Bank's assets if the Comptroller became satisfied that the Bank was insolvent and chose to place it in receivership.

15 F.3d at 1074 (citations omitted).

Here, the reasonable investment-backed expectations of an investor in the Enterprises are certainly no greater than the expectations in *Golden Pacific*, *California Housing Securities*, and *American Continental*. As the court noted in *American Continental*, "[b]ecause of the highly regulated nature of federally insured banking and because the government did no more than exercise its authority under statutes that pre-existed plaintiffs' investment, the government's assuming control of [the savings and loan] could not possibly have interfered with plaintiffs' reasonable investment-backed expectations." *Am. Cont'l Corp.*, 22 Cl. Ct. at 697. Similarly, because plaintiffs invested in highly regulated Government-sponsored entities, actions by the

35

Government and the conservator after the placement of the Enterprises into conservatorships could not, as a matter of law, interfere with their reasonable investment-backed expectations. *See Golden Pacific*, 15 F.3d at 1074.

Relevant to reasonable investment-backed expectations, plaintiffs rely upon statements in the Certificates of Designation that accompanied their preferred shares. Compl. ¶¶ 36-39. Complete copies of the Certificates of Designation are publicly available, and contain identical language as to the provisions regarding the payment of dividends. *See, e.g.*, http://fanniemae.com/resources/file/ir/pdf/stock-info/Series_Q_10012007.pdf. Purchasers of preferred shares were advised that dividends are declared and paid at the "sole discretion" of the Boards of Directors. *Id.* (Holders of preferred stock are entitled to receive a quarterly dividend "when, as and if declared by the Board of Directors of Fannie Mae . . . in its sole discretion out of funds legally available therefor . . . .").[19]

Moreover, in this case, because the Enterprises were insolvent in 2008, as plaintiffs acknowledge, plaintiffs could not have reasonably expected any return on their investment. Thus, any investment-backed expectations that might have existed prior to the financial crisis in 2008 were necessarily extinguished when the Enterprises became insolvent.

Plaintiffs also allege that they were entitled to rely on the FHFA Director's public statement at the time the Enterprises were placed into conservatorships. Compl. ¶ 43. We agree. In the statement by FHFA Director dated September 7, 2008, the day the Enterprises were placed into conservatorships, Mr. Lockhart declared that, during the period of the conservatorships and

---

[19]  This parallels that general principle from the law of corporations that a firm's board of directors possesses sole discretion to determine whether, and in what amount, dividends will be paid to shareholders.  11 *Fletcher Cyclopedia of the Law of Corporations* § 5325; *see New York v. Nickals*, 119 U.S. 296, 303-07 (1886) (corporate managers possess the power to determine when dividends will be paid); *Wabash Ry. Co. v. Barclay*, 280 U.S. 197, 203 (1930) (same).

in order to conserve capital, "the common stock and preferred stock dividends will be eliminated."  *See* http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf at 8.

Given these affirmative allegations, plaintiffs cannot credibly contend that they possessed reasonable expectations of dividends at any time, much less while the Enterprises are in conservatorship.  Thus, plaintiffs fail to allege a viable regulatory takings theory.

Finally, with respect to the third *Penn Central* factor, character of the Government action, the proper analysis focuses on the question of whether the plaintiffs are being forced to bear a financial burden that should properly fall on the greater public.  *See Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1282, 1284 (Fed. Cir. 2009).  The Federal Circuit has recognized that "it is rational to attempt to impose the costs inherent in a certain type of business activity on 'those who have profited from the fruits' of the business in question."  *Branch*, 69 F.3d at 1580 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18 (1976)).

Here, Fannie Mae and Freddie Mac shareholders benefitted for years from the Enterprises' unique relationship with the Government.  Moreover, plaintiffs were shareholders when the Enterprises undertook the investments that ultimately rendered the companies unsafe and unsound, and continued to purchase shares during the conservatorships.  Compl. ¶¶ 21, 34-35.  In the American system of finance, shareholders properly should absorb the costs that arose from these investments and the resulting Government rescue.  Certainly, United States taxpayers should not be made to indemnify plaintiffs for the poor performance of their companies.  This point is even clearer here, where taxpayers – not shareholders – intervened and risked billions to rescue the Enterprises.  Thus, plaintiffs cannot claim now that they are somehow entitled to profit from the Enterprises' recoveries.  Under *Penn Central*, the character of the Government's actions undermines plaintiffs' takings claim.

37

**D.      Plaintiffs' Claims Are Not Ripe For Judicial Review**

The Court should dismiss plaintiffs' takings claims on ripeness grounds because the

claims are contingent on uncertain, future events.

Plaintiffs allege that execution of the Third Amendment took plaintiffs' rights as

shareholders.  Compl. ¶ 83.  This, however, is sheer speculation; plaintiffs cannot know when,

how, or at what value the Enterprises will exit the conservatorships.  Therefore, plaintiffs' claims

are not ripe for judicial review, and the Court should dismiss plaintiffs' claims for lack of

jurisdiction.

**1.      This Court May Not Consider Claims That Are Not Ripe**

Article III of the United States Constitution limits Federal court jurisdiction to "Cases" or

"Controversies."  U.S. Const. art. III, § 2.  The case-or-controversy requirement of Article III

"prohibits federal courts from issuing advisory opinions or deciding disputes that are not

concrete and adverse."  *Mass. Bay Transp. Auth. v. United States*, 21 Cl. Ct. 252, 257 (1990)

(citing *United Pub. Workers v. Mitchell*, 330 U.S. 75, 89 (1947)).  "Although established under

Article I, the [Court of Federal Claims] traditionally has applied the case or controversy

requirement [of Article III] unless jurisdiction conferred by Congress demands otherwise."

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 657 (2003) (quoting *Mass. Bay

Transp. Auth.*, 21 Cl. Ct. at 257-58).

The ripeness doctrine "stems from the Article III case or controversy requirement[]" and

prohibits Federal courts "from deciding hypothetical, abstract, or contingent claims."  *Mass. Bay

Transp. Auth.*, 21 Cl. Ct. at 258 (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-41

(1937)); *Buckley v. Valeo*, 424 U.S. 1, 114 (1976)).  "The 'basic rationale' of the ripeness

doctrine is 'to prevent the courts, through premature adjudication, from entangling themselves in

abstract disagreements.'"  *Maritrans*, 342 F.3d at 1359 (quoting *Abbott Labs. v. Gardner*, 387

U.S. 136, 148 (1967)).  If a plaintiff's claim is not ripe for review, "the court lacks subject matter

jurisdiction to adjudicate the dispute."  *Beekwilder v. United States*, 55 Fed. Cl. 54, 60 (2002).

"A plaintiff's failure to present a ripe dispute is a defect that goes to the heart of the court's

jurisdiction to hear the claim."  *Id.* (citing *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725,

735-40 (1997)).

A claim is not ripe for judicial review when it is "contingent [upon] future events that

may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S.

296, 300 (1998) (quotation omitted).  In deciding whether a case is ripe for judicial review, the

Court must determine (1) "the fitness of the issues for judicial decision," and (2) "the hardship to

the parties of withholding court consideration."  *Abbott Labs.*, 387 U.S. at 149.

## 2.   Plaintiffs' Claim For Loss Of Dividend Rights Is Not Ripe

Plaintiffs allege that the execution by FHFA of the Third Amendment to the stock

agreements diminished their right to dividends declared by the Enterprises.  Compl. ¶ 84.  These

allegations, however, are premature.

It is undisputed that, before the Third Amendment and its "net worth sweep" provision,

the Enterprises were required to pay a fixed dividend based on the amount Treasury infused into

the Enterprises.  Compl. ¶ 3.  After the Third Amendment, Fannie Mae and Freddie Mac owe

nothing if they are not profitable.  *Id.* at ¶ 6.[20]  Thus, the effect of the Third Amendment on

---

[20]  Under the "net worth sweep" provision in the Third Amendment, the Enterprises pay
to Treasury the amount, if any, by which their net worth as of the end of the immediately
preceding fiscal quarter exceeds an applicable capital reserve amount ($3 billion for 2013).
Compl. ¶ 71.  "Net worth" is defined as the amount, if any, by which total assets (excluding
Treasury's funding commitment) exceeds total liabilities.  If either Fannie Mae or Freddie Mac
does not have positive net worth, or if its net worth does not exceed the applicable capital reserve
amount as of the end of a fiscal quarter, then that Enterprise pays no dividend for that period.

plaintiffs' shares cannot be ascertained because it is purely speculative and conjectural to assume that the Enterprises will be profitable over the entire period of the conservatorships.  Indeed, if one or both Enterprises were to suffer a setback, the Government would earn nothing under the Third Amendment, notwithstanding the Government's substantial investment of taxpayer dollars and the possibility that the Government will face additional outlays.  *See id*.  For this reason, an award of "just compensation" on the terms urged by plaintiffs could result in a substantial and unjust windfall to plaintiffs.

Moreover, plaintiffs acknowledge that Treasury has committed to provide a minimum of $400 billion to Fannie Mae and Freddie Mac, and there is no guarantee that the Enterprises will not make additional draws from Treasury under the Stock Agreements.  The question of whether the Government has "taken" any money from plaintiffs is not ripe because the issue is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *See Texas*, 523 U.S. at 300.  The ultimate effect of the conservatorship and Third Amendment on the Enterprises is unknown, and any loss of dividends allegedly stemming from these actions is purely hypothetical and speculative.  *See Mass. Bay Transp. Auth.*, 21 Cl. Ct. at 260-61.

Finally, whether and when Fannie Mae and/or Freddie Mac will emerge from conservatorships is unknown:  additional Government action will – eventually – determine when and how the conservatorships end.  Congress may take action, or FHFA may ultimately decide to end the conservatorship or place one or both Enterprises into receivership, leading to a liquidation of assets.  At a minimum, the conservatorships must end before the plaintiffs' claims can ripen.  *See Commonwealth Edison Co.*, 56 Fed. Cl. at 658-59; *cf. Maritrans*, 342 F.3d at 1359 (plaintiff's takings claim was ripe for judicial review where "[n]o additional government action is required to determine when or if the retirements [of certain vessels] will take place").

40

Accordingly, plaintiffs' takings claim is not ripe for judicial review, and the Court should

dismiss for lack of jurisdiction.  *Beekwilder*, 55 Fed. Cl. at 60 (citing *Suitum*, 520 U.S. at 735).[21]

### 3.      Plaintiffs' Claim For Loss Of Liquidation Preference Rights Is Not Ripe

Plaintiffs also allege that FHFA's actions have taken their "liquidation rights" (also called

a "liquidation preference") without just compensation.  Compl. ¶¶ 78, 84, 93.  Yet plaintiffs

acknowledge that the Enterprises remain in conservatorship and are not facing receivership and

liquidation.  Compl. ¶ 5.  Plaintiffs' claim, therefore, requires the Court to speculate if and when

the Enterprises will be placed into receivership – and liquidated – as well as whether and how

much of a liquidation surplus will be available for distribution.

Put differently, the effect of the Third Amendment on any liquidation surplus cannot be

assessed, much less known, unless and until the Enterprises are liquidated.  In fact, this is clearly

stated in the liquidation provisions plaintiffs reference in their complaint.  *See* Compl. ¶ 7

(payments at time of liquidation are contingent upon "dissolution, liquidation, or winding up of

Fannie Mae and Freddie Mac.").  Plaintiffs' claim, therefore, assumes a scenario (liquidation)

that has not happened and may never happen.  For this reason, the claim is unripe and the Court

must summarily reject any alleged taking of plaintiffs' rights in liquidation.

---

[21]  The Court should not interpret our ripeness argument to concede that plaintiffs possess cognizable property rights in their shares or in the profits of Fannie Mae and Freddie Mac.

## CONCLUSION

For these reasons, the Court should dismiss plaintiffs' claims, both for lack of subject matter jurisdiction and for failure to state claims upon which relief may be granted.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

OF COUNSEL:

s/ Kenneth M. Dintzer

PETER A. BIEGER
Assistant General Counsel
KATHERINE M. BRANDES
Attorney Advisor
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C.  20220

KENNETH M. DINTZER
Acting Deputy Director

ELIZABETH M. HOSFORD
GREGG M. SCHWIND
Senior Trial Counsel

KATY M. BARTELMA
SETH W. GREENE
ERIC E. LAUFGRABEN
DANIEL B. VOLK
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480 Ben Franklin Station
Washington, D.C.  20044
(202) 616-0385
(202) 307-0972 fax
kenneth.dintzer@usdoj.gov

December 9, 2013

Attorneys for Defendant